## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MASJID MUHAMMAD-DCC, et al., )
        Plaintiffs, )
    )
    )
v.     )     C.A. No. 77-221-SLR
    )
PAUL KEVE, et al., )
        Defendants. )

FILED

NOV 16 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

PD scanned

## PLAINTIFFS' REPLY BRIEF TO DEFENDANTS' RESPONSE
## TO MOTION TO ENFORCE JUDGMENT

### FACTUAL BACKGROUND

In 1979 plaintiffs won a lawsuit against officials of the Delaware Department of

Correction ("DOC") in the case *Masjid Muhamad-DCC, et al. v. Keve, et al.,* 479 F.

Supp. 1311 (D. Del. 1979).

1. Judge Stapelton presided over the proceedings and trial and issued the

following order:

> The individual plaintiffs are entitled to injunctive relief
>
> which will assure their access to the information regarding
>
> the pork content of food served at D.C.C. which is
>
> available to the kitchen staff. In addition, they have
>
> established their right to have mail addressed to them solely
>
> in their Muslim names delivered as any other mail and their
>
> ~~right to have mail addressed to them solely in their Muslim~~
>
> ~~names delivered as any other mail and their~~ right to be free
>
> of the imposition of punishment of any kind as a result of
>
> their failure to use or acknowledge their non-Muslim
>
> names. Finally, each of the individual plaintiffs is entitled

1

to have a judgment against Superintendent Redman entered

in his favor in the amount of One Dollar.

2. Pursuant to the court's order, DOC officials paid one dollar; ceased to refer to plaintiffs in their slave (non-Muslim) names; posted information pertaining to plaintiffs in their Muslim names only; issued identification cards in the Muslim names only; submitted to regular inspection of the kitchens for food labels and meal preparation to assure that pork was not served.

3. DOC, with only minor, temporary exceptions, complied with the court's order.

4. Plaintiff Fatir's records, classification, education diplomas and certificates, etc. were all in his Muslim name. (See Exhibit 1.)

5. Fatir was transferred to Arizona in his Muslim name and remained there for nine years (from 1996 until Dec. 2004) and was returned from Arizona to Delaware pursuant to the settlement of a § 1983 civil suit in his Muslim name.

6. One of the defendants in this case was then Commissioner of Corrections, James T. Vaughn. After being fired from his job as Commissioner, Vaughn was elected to the Delaware legislature and, as a state senator, sponsored the bill which became § 5901, the state statute which defendants would have this court believe justifies their defiance of the federal court order regarding plaintiffs' name changes decades before the state law was even passed.

**LEGAL STANDARD**

7. Defendants have mischaracterized the legal standard by claiming that the standard is that which pertains to the granting of injunctive relief.

8. The fact is that this case has already been litigated and won by plaintiffs and this court has already issued a permanent injunction. Therefore, the four prongs

2

necessary for the granting of injunctive relief are not applicable here since the injunction relief has already been granted.

9. The appropriate standard is enforcement of a federal court's judgment and what sanctions are appropriate when defendants have defied and violated a federal court's clear order.

### THIS COURT HAS THE POWER TO ENFORCE ITS JUDGMENTS

10. Defendants are in violation of Rule 70 of Fed.R.Civ.P. and this court has the power to enforce its judgment and to hold defendants in contempt.

District courts retains jurisdiction to enforce their injunctions, lawful orders and consent decrees. *Cox v. Zale Delaware, Inc.,* 239 F.3d 910. *In re Unioil,* 948 F.2d 678. *Hook V. State of Ariz. Dept. of Corrections,* 972 F.2d 1012. *Adams v. U.S.,* 255 F.3d 787.

11. This court's authority to issue all writs necessary in aid of its jurisdiction under All Writs Act includes power to issue subsequent order needed to implement earlier order which court had authority to issue. This includes the power to issue any subsequent orders needed to implement an earlier order.18 U.S.C.A. § 1651. *U.S. v. Friedman,* 143 F.3d 18.

12. A federal court has the power to issue any order that is necessary to enforce valid federal court decree, including order to pay, against a state that violates that order, regardless of whether enforcement order is characterized as one of civil contempt or as equitable supplement to consent decree. *Wisconsin Hosp. Ass'n v. Reivitz,* 820 F.2d 863.

13. Defendants have not put forth a compelling argument to justify its violation and defiance of this court's order.

### JUDGMENT OF CONTEMPT IS THE ONLY PROPER WAY TO DEAL WITH DOC'S NONCOMPLIANCE

14. Sanctions are necessary to bring about compliance and to prevent non-compliance in the future and to demonstrate the supremacy of the federal courts and the seriousness of a federal court order when DOC has shown contempt for the orders of that court.

15. "While a federal court is always reluctant to coerce compliance with its decrees by incarcerating a state official, if that official is in contempt there can be no doubt of the court's authority to do so. See Hutto v. Finney, 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978). State officials are not above the law.

16. "Another sanction might be to fine the recalcitrant officials. 'Civil contempt may… be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance…. If [a state official] refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance.' Id. At 691, 98 S.Ct. at 2573." *Newman v. State of Alabama*, 683 F.2d 1312, 1318 (1982).

17. Plaintiffs have not, in the instant case, asked this court to incarcerate the offending defendants. If, however, this court, in its wisdom, were to determine that such incarceration was necessity to assure compliance and respect for the rule of law, plaintiffs would not object.

"[W]here the purpose [of a finding of contempt] is to make the defendant comply, the court… must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of America*, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1974).

4

18. "A sanction imposed to compel obedience to a lawful court order or to provide compensation to a complaining party is civil. See *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701-02, 91 L.Ed. 884 (1974); *Hess v. new Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 115 (2d Cir. 1988); In re Grand Jury Witness, 835 F.2d at 440-41; *International Business Machines Corp. v. United States,* 493 F.2d 112, 115 (2d Cir. 1973), cert denied, 416 U.S. 995, 94 S. Ct. 2409, 40 L.#Ed.2d 774 91974)." *N.Y. State National Organization for Women v. Terry*, 886 F.2d 1339 (2nd Cir. 1989), 1351.

19. "A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. See *EEOC v. Local, 638, Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1178 (2d Cir. 1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 l.Ed.2d 344 (1986); *Powell v. Ward, 643 F. 2d 924, 931 (2d Cir.) (per curiam), cert denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). These prerequisites have been satisfied here." *N.Y. State National Organization for Women v. Terry*, 886 F.2d 1339 1351 (2nd Cir. 1989).

20. As in *N.Y. State N.O.W. v. Terry*, supra, DOC has failure to comply is clear and unambiguous. Defendants' non-compliance is "clear and convincing;" nor have defendants "diligently attempted in a reasonable manner to comply."

21. "When imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's

5

financial resources and the consequent seriousness of the sanction's burden. *Dole Fresh Fruit Co. v. united Banana Co.,* 821 F.2d 106, 110 (2d Cir. 1987); *Perfect Fit*, 673 F.2d at 57. See also *United Mine Workers*, 330 U.S. at 304, 67 S.Ct. at 701-02. The ultimate consideration is whether the coercive sanction... is reasonable in relation to the facts. That determination is left to the informed discretion of the district court. See In re Grand Jury Witness, 835 F.2d at 443." *N.Y. State National Organization for Women v. Terry*, 886 F.2d 1339 at 1353 (2$^d$ Cir. 1989).

22. In selecting the means to enforce a judgment, the district court is entitled to rely on the axiom that courts have inherent power to enforce compliance with lawful orders.

**A STATE STATUTE ENACTED AFTER THE FACT WHOSE PURPOSE IS TO CONTRAVENE AFEDERAL COURT ORDER IS UNCONSTITUTIONAL AND UNLAWFUL**

23. A change in state statute cannot lawfully have retroactive application to Plaintiffs 30 years after their names have been changed.

24. The Supremacy Clause of the United States Constitution and the All Writs Act U.S.C.A. 28 § 1651 precludes the state of Delaware from disobeying a federal court order by passing and retroactively applying a state statute which contravenes the federal court order.

25. The All Writs Act states that "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and and agreeable to the usages and principles of law."

26. "The All Writs Act, 28 U.S.C. § 1651, empowers the federal courts to enjoin state proceedings that interfere, derogate, or conflict with federal judgments, orders, or settlements. *Keith v. Volpe*, 118 F.3d 1386.

6

27. If the state name change statute is tenable at all, it could only be applied to people convicted and committed after the effective date of the new law, and that is, itself, highly questionable.

28. The overwhelming majority of incarcerated people who have changed their names are Muslims and Black. The state law is obviously aimed at Muslims and Blacks since very few, if any, Christians have changed their names while in Delaware prisons.

29. By creating a law whose design and effect is to discriminate against a cognizable class for reasons of racial and religious discrimination, Delaware has run afoul of both the First Amendment and the Fourteenth Amendment to the U.S. Constitution's equal protection clause.

30. Fatir **legally** changed his name in accord with the laws that existed at the time. The law in Delaware and several other states was quite clear, i.e., that the change of name by a person via common law was just as legal as a change done via the court. In fact, the sole purpose of changing one's name via any court was to establish a court record of the name change. Since Fatir has established a record through numerous actions in court -- both state and federal -- his name change through the court was and is already established and doing so again and again in state court would serve no purpose other than to harass plaintiff for his religious beliefs and for exercising his right to change his name in accord with those beliefs.

31. To require Fatir to change his name again -- three decades after already so doing -- would mean that Delaware must also require all women who've changed their names via common law after getting married in the past 30 years to do so again in court. Moreover, children who have been adopted would also have to petition the court of

7

common pleas for a change of name. It is unconstitutional to create a law designed to curtail the right of one class of people but not to apply that law across the board. Moreover, it is unconstitutional for Delaware Department of Correction to attempt to apply a new law retroactively to people who have conducted their business and lives under the existing law. Delaware Department of Correction cannot constitutionally continue to move the goal posts to quench some atavistic thirst to force people to worship their Christian god.

32. Defendants seek to invert the Supremacy Clause and make federal courts subservient to legislators in the state who are all too often motivated by prejudice, bias, fear, outright racism and closet membership in organizations such as the Christian Knights of the Ku Klux Klan.

33. Title 10 § 5901 states: "When, based upon testimony or sworn affidavits, the court finds that a petition for a name change of an individual subject to the supervision of the Department of Correction **is motivated by a sincerely held religious belief, the court may grant such a petition."**

34. § 5901 makes the state somehow capable of determining someone's religious sincerity, something no priest, minister, imam, rabbi or pope has yet been able to do in the entire history of religion. On its very face § 5901 is violative of both the First Amendment and the doctrine of separation of church and state. This statute makes the prison commissioner, buttressed by a common pleas magistrate, some kind of Grand Ayatollah or High Priest who can mystically peer into the depths of a man's or woman's soul and measure his or her degree of sincerity in matters of God and faith.

8

35. This is precisely the kind of business which the First Amendment was drafted to keep government far away from. This court should declare the whole of that absurd statute utterly unconstitutional and wholly an embarrassment to any purported democracy.

36. The only legitimate purpose for which DOC could use the non-Muslim, offensive, slave name was for cross-reference and its own internal records. In today's automated environment, even that usage becomes questionable since all records are keyed on the S.B.I. number which, at the time of this case's trial, was not in use by the prison system.

37. Defendants have failed to show any compelling reason why this court should not enforce its order or how defendants would be irreparably harmed by such enforcement. In fact, defendants freely admit that they did adhere to this court's order for decades without any deterioration of its legitimate interests such as security ,safety, rehabilitation and employment of inmates. The only thing that has been harmed by compliance with this court's order are the feelings of those defendants and their successors who feel offended when the children of slaves refuse to give honor to the slave masters by calling themselves by the names of those who once owned, tortured, raped, abused and murdered plaintiffs' ancestors in the name of the white Christian god. It is for that reason that the name usually used for what defendants call one's "committed name" is "Christian name."

38. Most guards do not ask for Fatir's "committed name" when he refuses to call himself "Hobbs." They ask, "What is your Christian name?" The two are actually synonymous.

9

39. A state may not constitutionally make laws for the purpose of countermanding a federal court's orders. Moreover, this court did not reach its decision based on state law. It reached it based upon the United States Constitution which, beyond the reach of the late Senator-Defendant Vaughn, has not been changed to appease the religious racism of the officials of the Delaware Department of Correction.

40. In an effort to mischaracterize plaintiff's motion to enforce the judgment, defendants claim that "In essence, plaintiff is alleging that prison officials have violated his right to freely practice his chosen religion by requiring him to use both his chosen religious name and the name under which he was committed."

41. Although it is true that defendants have prevented plaintiff from freely practicing his religion since the day he arrived in Delaware in 1975 – going so far as to try to entice other inmates to attack him by offering furloughs, threatening him with death, bringing a gun into the institution to shoot him during services at the chapel – the instant request before this court is for an order enforcing compliance with its permanent injunction and a finding of contempt on the part of defendants.

42. Defendants claim that no sanctions have been imposed for failing to acknowledge the offensive slave name. That "Wearing a name tag in a prisoner's committed name for identification purposes is appropriate. In addition, the Department has rescinded its practice of refusing to process mail addressed to inmates in their Muslim names."

43. In fact, Fatir has been threatened with sanctions, missed visits, been insulted and ridiculed by staff members for his use of his legal Muslim name. Plaintiff Abdul-

10

Haq (Wilbur) Shabazz was put into SHU Supermax for failing to acknowledge his slave name and remains held there to this day, more than two years later.

44. The DOC name tag (if forced wearing of identification tags are constitutional at all) bearing plaintiff's slave name is the basis of all DOC identification, passes, lists, roll calls, mail, phone calls, etc. Any name other than the name on the identification plate is only a nickname as far as daily prison activities and living is concerned. To force Fatir to wear identification in anything other than his Muslim name puts his name on an equal footing with prison nicknames like "C-Murder," "Short Dog," "Big Pimpin'," and "Gangstarr the Rockstarr."

45. Defendants' very admission that they "rescinded its practice of refusing to process mail addressed to inmates in their Muslim name" is an admission of their intentional disobedience of the court's order which stated unequivocally that plaintiffs "have established their right to have mail addressed to them solely in their Muslim names delivered as any other mail."

46. Defendants have failed to provide any evidence of hardship or harm endured by defendants during 30 years of compliance with the law, including plaintiff' having his name tag in his name of Amir Fatir for decades.

47. Since Plaintiff was committed to Delaware Department of Correction from Arizona on December 4, 2004 under the name Amir Fatir, that name (Amir Fatir) is actually his "committed name," not the slave name (Sterling Hobbs) which has not been known by since 1976.

**ONLY PLAINTIFFS ARE AUTHORIZED TO INSPECT FOR PORK CONTENT**

48. No one except the plaintiffs is authorized to verify compliance with the no-pork rule. Neither DOC's Wahabi sect Imam nor any other inmate selected by defendants can lawfully perform the function which this court awarded to plaintiffs.

49. "Unless government consent decree stipulates that it may be enforced by third party beneficiary, only parities to decree can seek enforcement of it." *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 314 U.S. App. D.C. 1, rehearing and suggestion for rehearing denied.

50. The case was not fought and won so that the prison administrators could select inmates beholden to them to supposedly look out for plaintiffs' rights. The court order held: **The individual plaintiffs** are entitled to injunctive relief which will assure their access to the information regarding the pork content of food served at D.C.C. which is available to the kitchen staff." *Masjid Muhammad-DCC*, supra, at 1328.

51. The order did not state that defendants could select any old inmate, especially a "kitchen worker" who might well be burdened with the conflict of interest of pleasing his boss in the kitchen and checking to see that the food was pork-free. Only one of the individual plaintiffs – Abdul-Haq Shabazz, Muhammad Ali, Rauf Muhammad, Mumin Rahim, Amir Fatir, Shamsiddin Ali and Amin Hassan – can lawfully check for pork content.

52. For their disobedience of the federal court order and their disregard and disrespect for the federal court injunction, defendants must not only be compelled to comply with the order, they must also be sanctioned and forced to pay money for their contempt of court.

**LIMITATIONS ON PRISON'S USE OF PLAINTIFFS' NON-MUSLIM NAMES**

53. Defendants' indicate that they were not required by this court's order to use plaintiffs' non-Muslim names "for all purposes." (See Department of Correction Administrators' Response to Plaintiff Amir Fatir's Motion to Enforce Judgment, paragraph 13.)

54. Judge Stapleton meticulously reasoned the issue of the name change of plaintiffs and wisely limited the prison administrators' authority to use plaintiffs' non-Muslim names. "It does not follow, however, that plaintiffs are entitled to have the institution and its staff utilize their Muslim names for all purposes. ... [F]or example, this Court has previously held that a Muslim inmate has no constitutional right to dictate how prison officials keep their records of prisoners. Al-Haqq Rauf Hassan Abdul Muhammad v. Redman, Civil Action No. 78-12 (D. Del. January 11, 1978). Indeed, a State may identify its citizens by any name, number or symbol it chooses, and it may do so consistent with the First Amendment even though the means of identification may be personally offensive to the person identified." *Masjid Muhammad-DCC*, supra, at 1324.

55. Quite obviously Judge Stapleton intended usages such as internal record keeping used to assure identification of plaintiffs by cross-referencing and matching their slave names with their Muslim names. The Judge never contemplated that defendants would, as they do now, attempt to use his words as to justify forcing plaintiffs to use their non-Muslim names "for all purposes" save that of a kind of frivolous nickname.

56. Moreover, defendants could not use plaintiffs' non-Muslim names or require activities on the part of plaintiffs that discriminated against them. "Plaintiffs correctly point out that a State may not discriminate against or among inmates on the basis of religious conviction and that a policy which does no, whether on its face or in its

13

application, is impermissible under the equal Protection Clause. <u>Cruz v. Beto, 405 U.S.</u>
<u>319, 92 S.Ct. 1079, 31 L.Ed. 2d 263 (1972)</u> ; <u>Lee v. Tahash, 352 F.2d 970 (8th cir. 1965)</u> ;
<u>McLaughlin v. Cunningham, 344 F.Supp. 816 (W.D. Va. 1972)</u>. *Masjid Muhammad-*
*DCC,* supra, at 1324 n. 16.

57. Because 10 Del. C. § 5901 discriminates against Muslims "on its face or in its
application, is impermissible under the Equal Protection Clause."

58. As in the present circumstance, Judge Stapleton saw that defendants had gone
beyond what is permissible in their use of plaintiffs' non-Muslim names. "But the State
of Delaware, acting through the defendants, has done more than utilize plaintiffs' non-
Muslim names for identification purposes. It has required plaintiffs, upon pain of
punishment or the withdrawal of benefits, to utilize religiously offensive names to
describe themselves. **This it may not do absent a compelling state interest.**" *Masjid*
*Muhammad-DCC*, supra, at 1324 [emphasis added].

59. Implicit in this court's opinion and order is that the State cannot
constitutionally do more than utilize plaintiffs' non-Muslim names for other than internal
record-keeping identification purposes. Defendants offered no compelling state interest
then or now for using and forcing plaintiffs to use the religiously offensive non-Muslim
slave names.

60. "Numerous cases have held that administrative convenience is not a
compelling state interest. E.g., <u>Memorial Hospital v. Maricopa County, 415 U.S. 250, 94</u>
<u>S.Ct. 1076, 39 L.Ed.2d 306 (1974)</u> ; <u>Cleveland Bd. of Educ. V. LaFleur, 414 U.S. 632, 94</u>
<u>S.Ct. 791, 39 L.Ed.2d 52 (1974)</u> ; <u>Fronticro v. Richardson, 411 U.S. 677, 93 S.Ct. 1764,</u>
<u>36 L.Ed.2d 583 (1973)</u> ; <u>Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551</u>

14

(1972) ; Shapiro v. Thompson, 34 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). It is unnecessary to so hold in this case, however. Assuming that some level of administrative burden and expense might qualify as a compelling state interest, the minimal effort and expense necessary to recognize post-commitment name changes clearly does not rise to that level." *Masjid Muhammad-DCC,* supra, 1323-1324.

**PLAINTIFF FATIR IS NOT A WAHABI SECT SUNNI MUSLIM**

61. During Fatir's exile to Arizona via forced Interstate Corrections Compact in retaliation for his having exercised his First and Sixth Amendment rights, the Muslim community was co-opted by the prison administration and transformed into a Wahabi ("Salaaf") sect-only which denies non-Wahabis from any participation whatsoever with the administration's tacit acknowledgement and approval.

62. The Wahabi sect is an extreme, peculiar and fanatical sect founded by an illiterate Saudi Arabian named Ibn Wahab. It is the sect of "fundamentalists" to which al-Qa'idah leader Usama bin Laden and other "Jihadists" adhere.

63. Most of the more than one billion Muslims around the world reject the fanatical Wahabi doctrine and regard Wahabis as, if not outright insane, fanatical enough to be avoided as much as possible. Wahabi-Salaafs are the Islamic equivalent of Christians who handle snakes in a literal belief in the biblical statement that true believers would be able to lift up serpents unharmed.

64. Plaintiff Fatir is neither Wahabi nor Sunni. All sects are prohibited in the Quran.

65. Fatir is a scholar of Islam who has published books, interprets the Quran and other texts and compiled the first English concordance of the Quran in the world. His understanding of Islam has been sought by scholars of Islam from Pakistan, United Arab

15

Emirates and even Wahabi leaders such as the foundation for Wahabi-based publications American Trust Publications who asked Fatir to prepare an English-Arabic/Arabic-English Lexicon and to interpret the Hadiths and Sunnah. Fatir's exposure of serious errors in the "authorized" English translation of A. Yusuf Ali (which was analogous to the King James translation of the Bible for English-speaking Muslims) caused the Pakistani publisher, Sh. Ashraf, to request that Fatir indicate all of the mistranslations of the Arabic text into English, and to provide the correct translations. Fatir's exposure of the errors led to a revised version of the Yusuf Ali translation which purports (though fails) to correct the errors.

66. Although imminently qualified to interpret Hadith and Sunnah, Fatir declined to do so (although he did prepare the Lexicon) because he believes that Hadith and Sunnah are corruptions brought into Islam 264 years after the death of Prophet Muhammad.

67. Fatir's in-depth explanation of Islamic tenets, the Quran, the Hebrew Qaballah, Egyptian metaphysics and esoteric Christianity are posted on his website http://amirfatir.tripod.com.

68. Fatir believes that Elijah Muhammad was the most recent Messenger of Allah. Elijah Muhammad strictly and specifically forbade going to court to change one's name. The only permissible way an adherent to his teachings could change his name was by common law. This is what Fatir did.

69. Defendants efforts to force Fatir to change his name (again) in common law *pleas* court are, in effect, efforts to force Fatir to go against the person he believes spoke on behalf of Allah (God) Himself.

70. "Nor, absent a compelling state interest, can the State put a citizen to the choice of engaging in conduct or expression which is religiously offensive to him or her or suffering punishment. For this reason, a State may not, absent a compelling state interest, impose sanctions upon an inmate for failing to acknowledge that he is "John Smith" or for failing to perform a task under circumstances where performing it involves acknowledgment of a religiously offensive name. Since it appears that plaintiffs have received twenty-four hour lockups for failing to acknowledge their non-Muslim names, relief will have to be fashioned in this area also." *Masjid Muhammad-DCC*, supra, at 1325.

71. Were Fatir to seek a name-change via the Court of Common Pleas he would be in violation of the tenets of his faith. Judge Stapleton's opinion explored this type of forced compliance when he wrote: "In Stevens v. Berger, 428 F.Supp. 896 (S.D.N.Y. 1977), for example, an attack was made upon the State's insistence that applicants for welfare payments obtain and supply Social Security numbers as a condition of their entitlement to benefits. The plaintiffs, suing on behalf of themselves and their four minor children, testified that, in their view, the use of Social Security numbers was device of the Antichrist and that they feared that the children, if numbered in this way, might be barred from entering Heaven. Judge Weinstein, after satisfying himself of their sincerity of the plaintiffs and of the religious nature of their belief, held that the State, absent a compelling state interest, may not condition the conferral of a benefit on the willingness of a citizen to engage in conduct which is abhorrent to him or her on religious grounds. After reviewing the evidence with respect to the role of Social Security numbers in combating welfare fraud, the court concluded that the State's interest in policing its

17

welfare system could be effectively served without burdening the plaintiffs' right to the free exercise of their religion. The State was, accordingly, enjoined from requiring plaintiffs to submit Social Security numbers as a prerequisite to the receipt of benefits." *Masjid Muhammad-DCC*, supra, 1324-1325.

72. The same logic applies, once again, now. The State would force Plaintiff Fatir to re-change his name once more, this time in Common Pleas court in violation of the explicit religious commands of the Messenger of Allah (God), the Honorable Elijah Muhammad. Fatir fully believes that intentional disobedience of Elijah Muhammad will, unless God decides to be extraordinarily merciful, condemn one to Hell.

73. Fatir cannot, therefore, "buy a name," as Mr. Muhammad expressed it, via the Common Pleas Court without violating the tenets of his faith.

### 10 DEL. C. § 5901 VIOLATES SECTION 1 OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION

74. In relevant part the Fourteenth Amendment holds that **"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."**

75. 10 Del. C. § 5901's very purpose is to "abridge the privileges or immunities of citizens of the United States" in violation of the Fourteenth Amendment. On its very face, the statute is unconstitutional and cannot, retroactively, be applied to plaintiffs who achieved the right to use their Muslim names in this case and who are immune from having to respond to any religiously offensive non-Muslim slave name.

76. The purpose of the Fourteenth Amendment and of the civil rights statute, 42 U.S.C.A. § 1983, are to preserve and enforce, as against state action, those rights,

18

privileges and immunities secured by the Constitution and laws. *Golden v. Biscayne Bay Yacht Club*, 530 F.2d 16, cert. denied 97 S.Ct. 186, 429 U.S. 872, 50 L.Ed.2d 152.

77. The adoption of this amendment implied that there are matters of fundamental justice that the citizens consider so essentially an ingredient of human rights as to require restraint on action on behalf of any state that appears to ignore them. *Orleans Parish School Board v. Bush*, 242 F.2d 156, cert. denied 77 S.Ct. 1380, 354 U.S. 921.

78. The Fourteenth Amendment was designed to bar a state from denying to some groups, on account of their race or color, any rights, privileges and opportunities accorded to other groups. *Constantine v. Southwestern Louisiana Institute*, 120 F.Supp. 417.

79. Both the Fifth Amendment and the privileges and immunities clause of the Fourteenth are designed to protect the individual from invasion of his rights, privileges, and immunities by the federal and state governments respectively. *Schatte v. International Alliance of Theatrical Stage Emp. And Moving Picture Operators of U.S. and Canada*, 70 F. Supp. 1008, affirmed 165 F.2d 216, cert. denied, 68 S.Ct. 1018, 334 U.S. 812, 92 L.Ed. 1743.

80. Defendants' attempts to force plaintiffs to change their name in the Court of Common Pleas, retroactive to their having already legally changed their name decades earlier violates the Fourteenth Amendment and attempts abridge Plaintiffs' right to change their names via common law.

**WHEREFORE,** plaintiff asks this honorable court to enforce its order granting injunctive relief and to order defendants to pay each plaintiff $1,000.00 in contempt fines and whatever additional relief this court may deem appropriate.

Date:   November 14, 2007

Respectfully submitted,

Amir Fatir # 137010
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE  19977

# Certificate of Service

I, Amir Fatir hereby certify that I have served a true and correct copy(ies) of the attached Reply Brief upon the following parties/persons:

To: Ophelia M. Waters, Esq.

    Dept. of Justice

    820 N. French St.

    Wilmington, DE  19801

To:

To:

To:

To:

To:

BY PLACING IN A SEALED ENVELOPE, and depositing same in the United States Mail at the Delaware Correction Center, Smyrna, DE 19977.

On this 14th day of Nov., 2007

Amir Fatir

SBI # 137010

I/M: Amir Fatir
SBI# 137010 UNIT W
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



Clerk
U.S. District Court
844 King St, Lockbox 18
Wilmington, DE 19801

LEGAL MAIL